**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

ANTONIO LAMAR HARDY,

               Defendant.

Case No. 19-mj-118 (DAR)

Chief Judge Beryl A. Howell

**<u>MEMORANDUM OPINION</u>**

       The government has appealed a Magistrate Judge decision denying the government's motion for pretrial detention of the defendant, Antonio Lamar Hardy, who has been charged in a two-count criminal complaint with knowingly transporting an individual under the age of 18 in interstate commerce with intent that that individual engage in prostitution and any sexual act for which any person can be charged with a criminal offense, in violation of 18 U.S.C. § 2423(a), and knowingly attempting to recruit, entice, harbor, transport, provide, obtain, maintain, patronize, or solicit by any means, in and affecting interstate or foreign commerce, a minor female 16 years of age, knowing and in reckless disregard of the fact that the female had not attained the age of 18 years and that she would be caused to engaged in a commercial sex act, in violation of 18 U.S.C. § 1591. *See* Gov't's Mot. to Extend Stay of Release Order and for Review of Release Order ("Gov't's Mot."), at 1–2, ECF No. 11; Gov't's Mot. for Review of Release Order, ECF No. 12; Crim. Compl. at 1, ECF No. 1. These charges arise from evidence that the defendant, from approximately February 20, 2019 to March 14, 2019, engaged in sexual activities with a 16-year-old female minor ("N.H"), whom the defendant allegedly paid for these activities, and that he transported her across state lines in order to engage in these activities. *See* Crim. Compl. at 1; Aff. Supp. Crim. Compl. ("Aff.") at 1–2, ECF No. 1-1. The defendant, who

previously worked at the school N.H. attends, Aff. at 1; Gov't's Mot. at 5, allegedly picked up N.H. from locations in the District of Columbia and Virginia and transported her to his home and a hotel in Maryland in order to engage in sexual activities, Aff. at 2; Gov't's Mot. at 4, 12–13, 16. In exchange for sexual activities, the defendant allegedly paid N.H. cash and bought her items including a Nintendo Switch and a smartphone. Aff. at 6–7; Gov't's Mot. at 12. The defendant also allegedly purchased two videos from N.H., at least one of which depicted sexual activities between a man and a minor girl who attended high school. *See* Aff. at 5–6; Gov't's Mot. at 3–4, 7–8.

Based on the evidence proffered by the parties at a hearing on May 20, 2019 before this Court, the government's motion to detain the defendant was granted. *See* Min. Entry (May 20, 2019). This Memorandum Opinion sets out the findings and reasons for detention. *See* 18 U.S.C. § 3142(i)(1) (requiring that a detention order "include written findings of fact and a written statement of the reasons for the detention"); *see also United States v. Nwokoro*, 651 F.3d 108, 109 (D.C. Cir. 2011) (per curiam) (noting that the Bail Reform Act requires pretrial detention order be supported by "a clear and legally sufficient basis for the court's determination" in written findings of fact and a written statement of the reasons for the detention or in "the transcription of a detention hearing" (internal quotation marks omitted) (quoting *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988))).

## I.  BACKGROUND AND FINDINGS

This section provides a procedural history of this case and a summary of the parties' arguments regarding whether the defendant's relationship with N.H. was commercial and whether the defendant or members of his family attempted to convince N.H. to lie to or to stop cooperating with law enforcement.

**A.       Procedural History**

The defendant, a 22-year-old man, Aff. at 1, was arrested on May 3, 2019 on an arrest

warrant issued by the United States District Court for the District of Columbia in connection

with a Criminal Complaint charging the defendant with one count of sex trafficking of a minor,

in violation of 18 U.S.C. § 1591, and one count of transportation of a minor with intent to engage

in criminal sexual activity, in violation of 18 U.S.C. § 2423(a).  *See* Crim. Compl. at 1; Gov't's

Mot. at 1–2; Arrest Warrant Returned Executed (May 3, 2019), ECF No. 4.  The defendant

waived his preliminary hearing, *see* Waiver of Preliminary Hearing, ECF No. 8.  At the

defendant's initial appearance, the government moved to detain the defendant without bond

pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A).  Gov't's Mot. at 2.  After a continuance to

allow for initial discovery, a detention hearing was held on May 17, 2019, before a Magistrate

Judge, *see id.*; Min. Entry (May 17, 2019), who denied the government's motion for detention

and released the defendant on a personal recognizance bond to the third-party custody of his

uncle.  Gov't's Mot. at 2–3.  A number of release conditions were imposed, including 21 days of

home confinement, participation in the High Intensity Supervision Program, a curfew,

restrictions on internet usage, and a stay-away order pertaining to minors, including N.H.  *See*

Order Setting Conditions for Release ("Release Order") at 2, ECF No. 10.

Following the Magistrate Judge's decision, the government moved for a stay of the

release order to permit it to file a motion for review, which the Magistrate Judge granted, with

the stay set to expire at 5:00 PM on May 20, 2019.  Gov't's Mot. at 3; Min. Entry (May 17,

2019).  The government filed a motion to extend the stay of the release order in order to give this

Court time for review, and a hearing was held on May 20, 2019 at 2:30 PM.  *See* Min. Entry (May 20, 2019).[1]

### B.    Background of the Defendant's Relationship with N.H.

At the hearing, the government relied, as support for seeking the defendant's pretrial detention, largely on the factual allegations set out in the criminal complaint and in its motion for review of the release order.  In particular, evidence indicates that from approximately February 20, 2019 through March 14, 2019, the defendant engaged in sexual acts with N.H., a 16-year-old girl, that he paid N.H. cash and goods in exchange for sexual activity, and that he transported N.H. from locations in Virginia and the District of Columbia to his residence in Maryland and to a hotel in Maryland in order to engage in sexual activity.

N.H. and an unidentified 18-year-old male business partner operated an Instagram business in which N.H. prostituted herself and other minors.  Gov't Mot. at 3.  N.H. owned numerous Instagram accounts, one of which, "P.1.mp," was used to advertise sex videos and prostitution.  *Id.* at 5, 7.  The page advertised sex videos for purchase, most of which, according to N.H., involved girls who were under the age of 18.  *Id.* at 3, 6.  Law enforcement officers who reviewed N.H.'s Instagram account noted that the account listed several sexual services with a price next to each service, with an indication that payments must be made through a particular application.  *Id.* at 6.

On February 21, 2019, N.H., at the direction of her business partner, met with an individual who had contacted the business partner through Instagram looking to purchase

---

[1]      At the hearing, the government clarified that, because the hearing was held prior to the expiration of the stay of the Magistrate Judge's release order, the portion of the motion seeking to extend the stay was moot, and only the portion of the motion appealing the Magistrate Judge's decision to release the defendant remained ripe.  *See* Rough Transcript of Hearing (May 20, 2019) ("H'rg Tr. (Rough)") at 2:23–3:10 ("[N]ow we're just asking the Court to review the release order and for detention of the defendant pending trial.").  All citations to the May 20, 2019 hearing transcript cite to a rough draft of the transcript, since no final transcript is yet available.  Discrepancies in page numbers between the rough and any final transcript may exist.

pornography.  *Id.* at 3–4, 7; H'rg Tr. (Rough) at 5:17–25 (clarifying that this meeting occurred on February 21, 2019).  This buyer turned out to be the defendant, whom N.H. knew, since the defendant was employed at N.H.'s high school as an information and technology specialist. Gov't's Mot. at 4.  N.H. was not aware of the identity of the client before she went to the meeting.  *Id.* at 4, 7.[2]  At the meeting, the defendant indicated that he was looking for "sloppy oral" videos and provided N.H. with $20 in exchange for two videos.  *Id.* at 7.  N.H. gave the defendant her cell phone to allow him to look at the videos available and select two to purchase. *Id.*  Most of the videos were of girls under the age of 18 engaging in sex acts.  *Id.*  The defendant asked who was in the videos, and N.H. told him that most of them depicted a student from High School 1, although a different student from High School 2 was also depicted.  *Id.*  The defendant selected two videos for purchase, one of which, according to N.H., depicted a girl giving oral sex to a male; this girl attended High School 2, although N.H. did not know her precise age.  *Id.* Text messages N.H. exchanged with her business partner on February 21, 2019 indicate that the defendant, in addition to being interested in purchasing videos, was also interested in engaging in sexual activity with N.H. or "one of the girls."  *Id.* at 8–9.

The next day, February 22, 2019, the defendant used his Instagram account to communicate with N.H. via her Instagram account.  *Id.* at 10–11.  N.H. asked for "a favor" and indicated that she needed an adult to accompany her to get a tattoo that evening.  *Id.* at 11.  The defendant agreed, and he and his wife took N.H. to get a tattoo.  *Id.*  N.H. discussed these plans with a school administrator ("CW 1").  *Id.* at 5.  In her Instagram messages with CW 1, N.H.

---

[2]      The defendant was the SmarTrip card coordinator at N.H.'s high school.  Gov't's Mot. at 10.  According to defense counsel, N.H. had no interactions with the defendant at school "other than the normal course of dealing . . . [such as] getting her SmarTrip card and ID."  H'rg Tr. (Rough) at 4:18–5:14.  The defendant resigned from his position at N.H.'s school after his wife learned of his relationship with N.H., which occurred between February 28, 2019 and March 1, 2019.  Gov't's Mot. at 5.

referred to the defendant as her "Splenda-Daddy." *Id.* at 11. As N.H. explained to investigators, the term connoted that the defendant was "similar to a 'sugar daddy' but with less money to spend." *Id.* at 11 n.7.

The defendant and N.H. allegedly began to engage in sexual activities on or around February 23, 2019, although the government's papers confuse rather than elucidate the timeline of the defendant's relationship with N.H. At the hearing, the government indicated that N.H. and the defendant first had sex on the evening of February 23, 2019 at the defendant's residence in Maryland, after the defendant picked N.H. up from a location in the District of Columbia. *Id.* at 12; H'rg Tr. (Rough) at 26:7–25 (indicating that the defendant and N.H. first had sex at the defendant's house on February 23, 2019). Although the government states "we know [the defendant] takes [N.H.] to his house before he takes her to the hotel to engage in sex for money," H'rg Tr. (Rough) at 26:13–15, the government's motion also states that prior to going to the hotel, the defendant picked N.H. up from her grandmother's house in *Maryland* (not the District of Columbia), went to the District of Columbia to eat, went to CW 1's house in Maryland, went to a store in Virginia, all before eventually checking into a hotel in Maryland. Gov't's Mot. at 13. Although this timeline is not necessarily inconsistent with stopping at the defendant's home in Maryland at some point on February 23, 2019, the government does not make clear when, if at all, this stop occurred. Further, the government also indicates that the first time N.H. had sex at the defendant's residence was not her first time visiting the residence. *Id.* at 12. Indeed, the government's evidence could be read to suggest that the defendant and N.H. first had sex at the defendant's home in Maryland on February 24, 2019, rather than on February 23, 2019. Hotel records and data from N.H.'s iPhone indicate that the defendant and N.H. checked into a Maryland hotel in the early morning hours of February 24, 2019. *Id.* at 13. N.H.'s iPhone

contains videos of her, with the defendant visible or audible in the background, in a hotel room, and the videos were created in the early morning hours of February 24, 2019. *Id.* The government's motion also states that N.H. and the defendant went to the defendant's residence on February 24, 2019, *after* leaving the hotel. *Id.* at 14. Images from N.H.'s iPhone include pictures of the defendant taken outside his residence, with the pictures dated February 24, 2019, and a video of N.H. in the defendant's residence taken during the same time period. *Id.* From this jumbled timeline, whether or when the defendant and N.H. had sex at the defendant's residence on February 23 or 24, 2019 remains murky.

Regardless, the defendant and N.H. allegedly continued to engage in sexual activities until approximately March 14, 2019. Criminal Compl. at 1. Although N.H. could not specify the exact number of times she engaged in sexual activities with the defendant, she estimated at least six times. H'rg Tr. (Rough) at 7:4–7.

### 1. Evidence of the Commercial Nature of the Relationship

Despite confusion regarding the location of the defendant's first sexual encounter with N.H., the defendant concedes that he engaged in sexual activities with N.H. over a period of weeks. *Id.* at 19:20–25 (Defense Counsel stating: "[W]e are not disputing that there was this relationship."). He disputes, however, that their relationship was commercial. *See id.* at 14:19–22 ("[W]hat Judge Harvey hung his hat on essentially was the sufficiency of the evidence when it relates to the actual commercial sex between the two parties."); *id.* at 19:21–22 ("The question is whether it was quid pro quo, money for sex."). The defendant suggests that buying a sexual partner food and gifts is common in relationships, *id.* at 20:8–15, and that "there is not a single text message or any other type of electronic record of [defendant] ever mentioning that he's paying for sex acts," *id.* at 39:24–40:1. He further points to text messages between N.H. and the

defendant "talking about their feelings for each other, talking about their relationship," *id.* at 16:17–18, as evidence that "[t]his is not a prostitute talking to a John about a business transaction," *id.* at 16:19–20. The defendant further posits that N.H.'s pain over the defendant ending their relationship is "the motive for the fabrications that N.H. appears to be making." *Id.* at 16:24–18:17 (defense counsel detailing what he believes to be outright fabrications or at least inconsistencies in N.H.'s statements).

The government responds that although N.H. was not able to say with precision how many times she had engaged in sexual activities with the defendant, such activities occurred at least six times, and that "there were no occasions where there were sex acts performed not for payment." *Id.* at 7:4–7; *see also* Gov't's Mot. at 16 (N.H. indicated that that the defendant "paid her in cash each time the two had engaged in sexual acts"). Moreover, N.H. "stated that she viewed sexual encounters as business," Gov't's Mot. at 12, and that "[f]rom the beginning, N.H. told [defendant] he had to pay for her time," *id.* Although the defendant paid N.H. one time to "hang out" in his car, otherwise, the defendant "was basically paying to have sex with her." *Id.*; *see also id.* at 13 ("N.H. also clarified in a later interview that [defendant] paid her cash for the sex acts in which the two engaged at the hotel."); *id.* at 16 (N.H. indicated that the defendant gave her $300 in cash after engaging in sexual acts at his home, and on at least two other occasions of sexual activity at the defendant's home, gave her varying amounts of money after the sexual activity but not less than $150); *id.* at 21–22 (N.H., recounting to CW 1 her conversations with the defendant, explains that she texted the defendant that "our deal has been settled you got me a phone and paid me the money you owe" and the defendant responded "you are more to me than just business," after which N.H. stated "[b]ring me 600 right now and I will THINK ABOUT spending time with you," prompting the defendant to bring N.H. $600, after

which they engaged in sexual activity).  The defendant's phone also contains text messages in which the defendant agrees to provide N.H. money and Uber rides, and a bank statement indicating that the defendant withdrew $40 after being told that is "how much it was," with no indication as to what "it" refers to.  *Id.* at 24.  In addition to cash, the defendant gave N.H. a Nintendo Switch, a smartphone, and other items, in addition to paying for services on her behalf such as a manicure.  *Id.* at 12–13.

The government further points out that the commercial nature of the defendant's relationship with N.H. is plain, pointing to the initiation of the relationship when the defendant sought to purchase pornographic videos from an Instagram account that also advertised sexual services and listed prices for each such service.  *See* H'rg Tr. (Rough) at 24:20–25:25 (noting that the defendant was aware when he first made contact with N.H. that her business sold videos and sexual activities); *id.* at 30:20–32:12 (same); Gov't Mot. at 8–9 (Instagram messages indicating that the defendant was interested in purchasing sexual activities from N.H.'s business in addition to videos); *see also id.* at 12 (noting that in at least one text message that the defendant sent to N.H., the defendant asked N.H. "how much money he gave her").  The government argues that even if N.H. eventually developed "feelings" for the defendant, that does not "negate the fact that she was engaged in sex acts for money as she was advertising [and] as [defendant] was aware when he made contact with her in the first place."  H'rg Tr. (Rough) at 30:25–31:7; *see also id.* at 31:7–25 (arguing that when N.H. first reported the relationship to law enforcement, she acknowledged the commercial nature of her relationship with the defendant; the text messages regarding their feelings for each other were exchanged weeks later).

### 2. Law Enforcement Investigation Into the Defendant's Conduct and Alleged Obstruction of that Investigation

The government and the defendant also dispute whether the defendant ever told N.H. to lie to law enforcement or otherwise to cease cooperating with the investigation into the defendant's behavior. The chain of events leading to the law enforcement investigation began when the defendant's wife learned of the defendant's sexual relationship with N.H. between February 28, 2019 and March 1, 2019. Gov't's Mot. at 5; *see also id.* at 17–18 (indicating that the defendant's wife communicated with CW 1 during this time period, and that "CW 1 was suspicious there was some type of relationship between [defendant] and N.H."); *id.* at 22 (the defendant's wife told a witness, S.N., that "over the weekend of March 1, 2019," "she had learned from CW 1 that [defendant] was engaged in a sexual relationship with N.H."). At that point, the defendant left the home where he resided with his wife and his wife's aunt, *see id.* at 5, 13 n.8, and "sent an abrupt resignation letter to the school where he worked and which N.H. attended, and told N.H. to inform the school on Monday, March 4, 2019 [of their relationship] before [his] wife did so," *id.* at 5.

According to S.N., who gave statements to law enforcement when the defendant was arrested, after the defendant's wife learned of his relationship with N.H. over the weekend of March 1, 2019, S.N. was present when the defendant's wife called the defendant to confront him about his conduct. *Id.* at 22. S.N. recorded phone calls in which the defendant admitted that he was engaged in a sexual relationship with N.H., whom he met through N.H.'s "'business' Instagram page." *Id.* Once the defendant's family confronted him about his conduct, he "was adamant about getting a new phone, and did[] in fact change to a new cellular telephone that weekend." *Id.* The phone seized from the defendant upon his arrest was a new device activated in March 2019. *Id.* at 23. Investigators who reviewed the contents of the defendant's Instagram

account, pursuant to a warrant, found that the messages between the defendant and N.H. and between the defendant and CW 1 on certain Instagram accounts were deleted or removed from the defendant's account. *Id.* at 17; H'rg Tr. (Rough) at 22:23–23:6.

After the defendant's wife found out about the defendant's relationship with N.H., N.H. reported the relationship to a guidance counselor at her school, who was a mandated reporter and contacted law enforcement. Gov't's Mot. at 5. Detectives with the Metropolitan Police Department ("MPD") met with N.H., who "willingly provided [them] with numerous Instagram accounts she operated," *id.*, and also provided her iPhone for forensic examination, *id.*

Notwithstanding N.H.'s reporting of her relationship with the defendant, on March 10, 2019, the defendant made a five-hour audio recording of an interaction with N.H. *Id.* at 23. In this recording, the defendant discusses the ongoing investigation. *Id.* In response to the defendant's concerns about what law enforcement would find on N.H.'s phone, N.H. explained that she had "deleted stuff." *Id.* The defendant told N.H. that she had "to take that shit down," referring to the P.1.mp Instagram account. *Id.* The recording indicates that N.H. and the defendant engaged in sexual activity, and that the defendant "informed N.H. that he needed a way to contact [her] that would remain anonymous so no one would be aware of his contacts with [her]." *Id.* The defendant also posited that N.H. would graduate high school by the time the investigation of his conduct wrapped up, and stated that because "all the times we slept together was in Maryland. . . . D.C. can't really do nothing about that." *Id.* at 24. At one point the defendant told N.H., "[y]ou either need to be on my side, or you need to be against me." *Id.* At the hearing, the government indicated that N.H. also described to law enforcement a conversation she had with the defendant where he communicated something to the effect of

"those white people aren't trying to help you don't tell them what is going on," in an effort to dissuade N.H. from cooperating. H'rg Tr. (Rough) at 33:21–34:8.

In a March 11, 2019 Instagram conversation with CW 1, N.H. disclosed some details about her sexual relationship with the defendant. Gov't Mot. at 18. She "described the sexual relationship as business, and related she had sex with [defendant] for money and other items of value." *Id.* CW 1 "advised N.H. to be honest with law enforcement when they interviewed" her. *Id.* N.H. then told CW 1 that the defendant's family "was trying to cover up his sexual involvement with N.H." *Id.* She stated that the defendant told her "his mom said his aunt wants to adopt [N.H.] so this will just blow over," *id.* at 19, and that the defendant's wife "tried to get [N.H.] not to tell, said everything was going to be okay," and that the wife "wants to keep [N.H.] quite [sic]," *id.*, whereas the defendant's wife's aunt "told [N.H.] to tell and if [N.H.] did she would start to pay me the more I tell," *id.* at 20.

On March 13 and 27, 2019, with counsel present and under "use" immunity granted by the U.S. Attorney's Office and the Office of the Attorney General for the District of Columbia, N.H. was interviewed by law enforcement. *Id.* at 6 & n.4. She provided details about her Instagram accounts and the videos for sale and summarized the circumstances under which she sold videos to the defendant on February 21, 2019. *Id.* at 7–10. Law enforcement obtained a number of text or Instagram messages among N.H., the defendant, her business partner, and CW 1. *See id.* at 8–11, 14–16, 18–22.

During the course of an interview on March 27, 2019, N.H. "informed law enforcement that [defendant] had attempted to convince her not to cooperate with law enforcement." *Id.* at 15. She stated that the defendant "was aware of her March 13, 2019 interview" with the MPD and the Federal Bureau of Investigation Child Exploitation Task Force ("FBI-CETF"), and told

her to "lie to law enforcement about the nature of their relationship." *Id.* A March 13, 2019 text message indicates that the defendant told N.H. "you telling people stuff that isn't true," *id.* and that N.H. told the defendant she had "feelings" for him but that "once you say your done I maybe hurt but I never let people take back the pain that they gave me, I show them in a different way!" *Id.* at 15–16 (all typographical errors are from the original quoted text). The defendant stated "I agree my feelings are involved too," *id.* at 16, and "I'm just telling you do the right thing at the end of the day be truthful don't let no body take that from you. Just like you I don't like to be stabbed in the back that's all. I just need to know if you with me or not?," *id.*

The defendant protests that the government's own evidence indicates that the defendant was the first person to encourage N.H. to report her relationship with him to the school, *see id.* at 5, and that he later told N.H. to "do the right thing at the end of the day be truthful," *see id.* at 16; H'rg Tr. (Rough) at 16:7–16, *id.* at 20:22–21:2; *id.* at 39:15–17. The defendant suggests that "[t]his is not what someone does who is trying to obfuscate and obstruct." *Id.* at 39:17–19. Further, he questions the credibility of N.H.'s statements, which are uncorroborated and are at times inconsistent. *Id.* at 21:6–12; *id.* at 17:11–18:17.

The government conceded that the only text message that corroborates N.H.'s claim that the defendant or his family attempted to get her to stop cooperating with law enforcement was the March 11, 2019 text exchange with CW 1. *Id.* at 34:17–35:25. Nevertheless, the government argues that other communications, when considered against the background of the pending investigation, support an inference that the defendant attempted to obstruct the investigation or encourage N.H. not to get him in trouble. First, the government notes that the defendant only encouraged N.H. to report their relationship after he knew that his wife would report the relationship herself if N.H. did not. *See id.* at 8:12–25; *id.* at 11:21–23 ("[N.H.] was

sort of forced into disclosing [the relationship] by Mr. Hardy's wife finding out about [it] and threatening to go to the school if they did not."). Second, the government suggests that the defendant's text messages and recorded conversations suggest some attempt to encourage N.H. to side with him against law enforcement and to cover up the most problematic aspects of his relationship with N.H., namely, the commercial aspect of their sexual relationship. *See id.* at 9:8–17 (government suggesting that the defendant made "an obvious effort . . . to try to paint this as though he wasn't engaging in the transactional point of this that is obviously the problem. . . . he tries to get [N.H.] to . . . say what he's calling the truth in quotes which is it's just sex, there is no monetary aspect") *id.* at 23:10–19 ("[H]e is not perceiving himself to be in trouble for having sex with this girl so he's saying he's engaged in a sexual relationship with her" but has concerns about the commercial aspects of the Instagram account). For example, the defendant told N.H. that he doesn't "like to be stabbed in the back," Gov't Mot. at 16, and that he "just need[s] to know if you with me or not?," *id.* Third, the defendant purchased a new phone shortly after his relationship with N.H. was discovered, and evidently took steps to delete conversations from his own Instagram account. *See id.* at 17, 22–23; H'rg Tr. (Rough) at 23:3–6 ("[W]e know [defendant] deleted the contents of his Instagram . . . certainly his conversations between him and CW 1 and N.H."). Fourth, the defendant expressed concern to N.H. about the ongoing investigation, including the fact that law enforcement had access to N.H.'s phone. *See* Gov't's Mot. at 23. In this same conversation, the defendant sought a way to contact N.H. anonymously "so no one would be aware of his contacts with [her]," *id.* and said "[y]ou either need to be on my side, or you need to be against me," *id.* at 24. The government posits that although the defendant never directly told N.H. to lie—and indeed, he actually told her to "be truthful," *id.* at 16, the underlying implication of his statements about being "on my side," or being "with [him]"

were attempts to encourage N.H. not to implicate him in commercial sexual activity. *See* H'rg Tr. (Rough) at 9:8–17; *id.* at 23:10–19.

## II.    LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq*., provides that "a person awaiting trial on a federal offense may either be released on personal recognizance or bond, conditionally released, or detained," and "establishes procedures for each form of release, as well as for temporary and pretrial detention." *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) (citing 18 U.S.C. § 3142(a)). The court is required, under 18 U.S.C. § 3142(f)(1), to hold a pretrial detention hearing, upon the government's motion for detention, before releasing any defendant charged with certain serious crimes, including "a crime of violence," which is defined to include "any felony under chapter 77, 109A, 110, or 117." 18 U.S.C. § 3156(a)(4)(C). A judicial officer "shall order" a defendant's detention before trial, *id.* § 3142(e)(1), if, after the detention hearing held under § 3142(f), and consideration of "the available information concerning" enumerated factors, *id.* § 3142(g), "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," *id.* § 3142(e)(1). The facts used to support this finding "shall be supported by clear and convincing evidence." *Id.* § 3142(f). Even if the defendant does not pose a flight risk, danger to the community alone is sufficient reason to order pretrial detention. *United States v. Salerno*, 481 U.S. 739, 755 (1987).

When a defendant is charged with enumerated offenses described in §§ 3142(e)(2), (e)(3) and (f)(1), "[s]ubject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" such an offense. 18 U.S.C. § 3142(e)(3). Once a rebuttable

presumption is triggered, the defendant bears the burden of production "to offer some credible evidence contrary to the statutory presumption," *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985), while the ultimate burden of persuasion remains with the government, *see United States v. Hir,* 517 F.3d 1081, 1086 (9th Cir. 2008); *see also United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003) ("In a presumption case such as this, a defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence [that] he does not pose a danger to the community or a risk of flight." (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)); *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (noting that the burden remains with the government to persuade the court that the defendant is a danger or poses a risk of non-appearance). The defendant is not required to rebut the presumption that the criminal activity is dangerous, or even to rebut the judicial finding as to probable cause, but only to "meet[] a 'burden of production' by coming forward with some evidence that he will not flee or endanger the community if released." *Dominguez*, 783 F.2d at 707.

The judicial officer considering the propriety of pretrial detention must consider four factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, . . . or involves a minor victim . . .;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and . . . whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). At the detention hearing, both the government and the defendant may offer evidence or proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1209–10 (D.C. Cir. 1996) (per curiam).

The standard of review for review of a magistrate judge's order for release is *de novo*, and a district judge conducting that review must "promptly," 18 U.S.C. § 3145(a), make an independent determination whether conditions of release exist that will reasonably assure the defendant's appearance in court or the safety of any other person or the community, pursuant to § 3142(e)(1). *See* 28 U.S.C. § 636(a)(2) (authorizing magistrate judges to "issue orders pursuant to section 3142 of title 18 concerning release or detention of persons pending trial"); *id*. § 636(b)(4) (directing that "[e]ach district court shall establish rules pursuant to which the magistrate judges shall discharge their duties"); D.D.C. CRIM. R. 59.3(a) & (b) (providing that a magistrate judge's order issued "in a criminal matter not assigned to a district judge" and "for which review is requested in accordance with this Rule may be accepted, modified, set aside, or recommitted to the magistrate judge with instructions, after de novo review by the Chief Judge"); *see also United States v. Henry*, 280 F. Supp. 3d 125, 128 (D.D.C. 2017) ("The Court reviews *de novo* whether there are conditions of release that will reasonably assure the safety of any other person and the community."); *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017) (noting that "although the D.C. Circuit has not yet addressed the issue, the many circuits that have agree that the district judge should review *de novo* a detention decision rendered by a Magistrate Judge") (collecting cases). "The Court is free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons." *United States v. Blanchard*, No. 18-mj-101 (GMH), 2018 WL 4964505, at *3

(D.D.C. Oct. 15, 2018) (quoting *United States v. Hubbard*, 962 F. Supp. 2d 212, 215 (D.D.C. 2013)).

## III. DISCUSSION

The defendant has not been indicted but, to date, charged only in a criminal complaint with one count of sex trafficking of a minor, in violation of 18 U.S.C. § 1591, and one count of transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a). *See* Crim. Compl. at 1. Upon a finding of probable cause to believe the defendant committed the charged offense, these are both the types of offenses that trigger the rebuttable presumption, under § 3142(e)(3), "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." *See* 18 U.S.C. § 3142(e)(3)(E) (including among enumerated offenses that trigger rebuttable presumption, "an offense involving a minor victim under section . . .1591 . . . [and] 2423"). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

At the defendant's preliminary detention hearing on May 16, 2019, the defendant stipulated that there was probable cause that he committed the charged offenses and waived his right to a preliminary hearing. *See* Gov't's Mot. at 2; Min. Entry (May 16, 2019); Waiver of a Preliminary Hearing at 1, ECF No. 8. The defendant's stipulation as to probable cause triggers the rebuttable presumption under § 3142(e)(3)(E).

The next task is determining whether the defendant has rebutted the presumption of pretrial detention by showing any condition or combination of conditions of release that will reasonably assure the appearance of the defendant as required and the safety of any other person and the community. In this regard, the defendant seeks to be released to the custody of his uncle,

where he is directed to have no access to internet-connected electronic devices and must stay away from N.H. and other minors. *See* Release Order at 2. The sufficiency of these proposed release conditions is addressed as part of consideration of the four factors, under 18 U.S.C. § 3142(g). On the current record, these factors favor pretrial detention and show that not even the stringent release conditions imposed by the Magistrate Judge can reasonably assure the safety of the community.

### A. Nature and Circumstances of the Charged Offenses

The first factor, the nature and circumstances of the charged offenses, favors detention, since the charged offenses are both extremely serious and involve the sexual trafficking of a minor and the transportation of a minor in order to engage in criminal sexual activity. Reflecting the seriousness of these charges, a violation of § 1591 involving someone under the age of 18 carries a mandatory minimum term of imprisonment of ten years, *see* 18 U.S.C. § 1591(b)(2), as does a violation of § 2423(a) involving someone under the age of 18, *see id.* § 2423(a).

The facts alleged by the government present a disturbing case of sex trafficking involving a minor and possible attempts to prevent that minor from cooperating with law enforcement. To minimize the risks of further harm, the Magistrate Judge imposed, as release conditions, *inter alia*, that the defendant be subjected to 21 days of home confinement, a curfew, restrictions on his internet usage, and a stay away order pertaining to N.H. and all other minors. *See* Release Order at 2. These conditions were intended to restrict the defendant's access to the internet and to mitigate the risk that he would continue to seek to purchase pornographic videos or sexual activities involving minor children.

These release conditions, however, are simply insufficient for several reasons.  First, the defendant has demonstrated a willingness to persist in sexual activities with a minor even after his wife learns of this behavior, he has resigned from his job as a result of such activities, and despite being under criminal investigation for that activity.  *See* Gov't's Mot. at 5, 23–24.  The failure of such consequences to deter the defendant in the past raise doubt as to whether any release conditions would be able to assure the safety of the community.  Second, the third-party custodian for the defendant is his uncle, and evidence in the record suggests that members of the defendant's family have already attempted to encourage N.H. to lie or not cooperate with law enforcement.  *See id.* at 18–19.  Although the uncle has not been mentioned as a source of such pressure, the government raised concerns as to whether any family member could adequately supervise the defendant under these circumstances, where the defendant already has a history of engaging in sexual activity with minors despite the knowledge of and disapproval of his family members.  *See* H'rg Tr. (Rough) at 13:10–14:2 ("This is someone who engaged in this conduct . . . in his own home and even once he knew the FBI was looking at him and he lost his job I just don't think the idea of a third-party custodian . . . does much to reassure that Mr. Hardy would not re-offend.").  This history does not inspire confidence that the defendant's uncle will have the sufficient ability, no matter how well intentioned, to monitor the defendant's compliance with his conditions of release.  Thus, the risk of re-offending looms large.  In light of the dangerousness to the most vulnerable members in our society—children—the proposed release conditions fall short of providing reasonable assurances for the safety the community.

## B.     The Weight of the Evidence

The Magistrate Judge raised thoughtful and important questions about the weight of the government's evidence in this case, particularly given the government's confusing description of

the chronology of the events, with a jumble of some undated and non-contextualized block quotations of text messages in lieu of argument. Moreover, as before the Magistrate Judge, the defendant has raised justifiable concerns about N.H.'s credibility, and noted both inconsistencies and a lack of corroboration regarding her descriptions of her relationship with the defendant and his alleged attempts to obstruct the investigation. *See* H'rg Tr. (Rough) at 17:1–18:20 (defense counsel noting N.H.'s "outlandish accusations that have no basis in reality," such as a claim that the defendant's family wanted to adopt her, that she had sex with the defendant's brothers, and her initial statement to the guidance counselor that the defendant had taken her to California, Washington, Florida, and New York—a statement that N.H. later said the mandated reporter "misunderstood," *see* Gov't's Mot. at 4 n.2). Although this Court's review of release decisions is *de novo*, the Magistrate Judge plainly carefully considered the circumstances of this case and any uncertainty regarding the weight of the evidence was not unfounded.

Nevertheless, upon review of the government's evidence and the parties' arguments at the hearing, the conceded facts of the defendant's relationship with N.H., together with the facts suggested by N.H.'s statements and the circumstances under which the defendant began his sexual relationship with N.H., demonstrate that the core elements of the charged offenses are supported by the substantial weight of the evidence. N.H. has consistently stated that her relationship with the defendant was commercial, and that she never engaged in sexual activity with the defendant without compensation. *See* Gov't's Mot. at 12–13, 16. As the government argued, whether N.H. eventually developed feelings for the defendant does not negate the initial commercial nature of their relationship, H'rg Tr. (Rough) at 30:25–31:7, and the defendant does not dispute that he engaged in a sexual relationship with N.H. or that he transported her across state lines to do so, *see id.* at 14:23–15:10 (defense counsel arguing that if the defendant is not

paying money for sex, then "this is a lawful relationship however ill-advised").  Evidence further

supports an inference that the defendant attempted to encourage N.H. to lie about or at least

cover up the commercial nature of their relationship, *see supra* in Section I.B.2, but even without

this evidence, the ample weight of the evidence favors detention.

      **C.**      **The History and Characteristics of the Defendant**

      As to the third factor, requiring consideration of the defendant's history and

characteristics, the defendant, age 22, has no prior criminal history and is deemed to be at a low

risk of re-offending.  Pretrial Services Report ("PSR") at 1, ECF No. 6.  Nonetheless, evidence

on the record suggests that he has committed other acts posing a risk of danger to others, even

beyond the charged offenses in this case.  The defendant, who worked at a high school, bought at

least one sexual video featuring a high school student through an Instagram account that also

advertised the sale of sexual activities with high school girls.  *See* Gov't's Mot. at 6–7.  Although

the defendant protests that the Instagram business does not specifically advertise underage

pornography, *see* H'rg Tr. (Rough) at 21:18–22:15, the circumstances of the purchase suggest

that the defendant was aware the girls featured were or could be underage—indeed, he bought

the video from N.H., a 16-year-old student at the high school where he was then employed, and

he confirmed with N.H. that the girls featured in the videos were high school students.  *See*

Gov't's Mot. at 7.  Further, although the defendant disputes that he engaged in any attempts to

prevent N.H. from cooperating with law enforcement, his continued entanglement with N.H.

during a pending investigation and his desire to seek out ways to communicate with her

anonymously, *see id.* at 23, do not inspire confidence that the defendant would not engage in or

attempt to engage in similar activity while released.  These history and characteristics suggest

that even though the defendant has no criminal history, no conditions or combination of conditions can reasonably assure the defendant's safety to the community.

### D.     The Danger to the Community

The fourth factor, the danger to the community posed by defendant, also weighs in favor of detention since the nature of the crimes charged—sex trafficking of a minor and **transportation of a minor with intent to engage in criminal sexual activity** —weighs heavily against release.  As discussed, *supra* in Section III.A, the significant harms and dangers of these crimes animated the Congress to create the statutory presumption of detention in these cases and to require a mandatory minimum of ten years' imprisonment upon conviction of either offense.  In addition, even after the defendant's conduct had been discovered by his wife and was being investigated by law enforcement, the defendant continued to engage in sexual activity with N.H. and to provide her with cash or other goods or services, such as Uber rides.  *See* Gov't's Mot. at 23–24. This persistent conduct, as noted above, *supra* in Section III.A, suggests that the defendant's release would pose a danger to N.H. or other minors.  For the aforementioned reasons, the Court believes that the defendant presents a significant danger to the community and, given the risks posed, finds that no condition or combination of conditions will reasonably keep the community safe were the defendant to be released.

## IV.     CONCLUSION

For the foregoing reasons, upon consideration of the evidence proffered at the detention hearing, the factors set forth in 18 U.S.C. § 3142(g), and the possible release conditions set forth in § 3142(c), the Court finds clear and convincing evidence that the defendant's pretrial release would constitute an unreasonable danger to the community, and that no condition or combination of conditions can be imposed that would reasonably ensure the safety of the community were he

to be released pending trial.  The defendant has failed to rebut the presumption in favor of pretrial detention required by § 3142(e)(3)(E).

Accordingly, the government's motion for review and appeal of the release order is granted and the defendant shall remain in the custody of the Attorney General for confinement pending a final disposition in this case.  An order consistent with this Memorandum Opinion and in accord with 18 U.S.C. § 3142(i), will be entered contemporaneously.

Date:  May 22, 2019

_____
BERYL A. HOWELL
Chief Judge